**IN THE COURT OF APPEALS OF IOWA**

No. 24-1546
Filed March 19, 2025

**IN THE INTEREST OF N.A., N.C., N.R., and N.D.,**
**Minor Children,**

**B.A., Father,**
        Appellant,

**N.R., Mother,**
        Appellant.
_____

        Appeal from the Iowa District Court for Black Hawk County, Linda Fangman,

Judge.


        A mother and father separately appeal termination of their parental rights.

**AFFIRMED ON BOTH APPEALS.**


        Joseph G. Martin, Cedar Falls, for appellant father.

        Luke C. Jenson of Jenson Law Firm, PLC, Waterloo, for appellant mother.

        Brenna Bird, Attorney General, and Lisa Jeanes, Assistant Attorney

General, for appellee State.

        Tammy L. Banning, Waterloo, attorney and guardian ad litem for minor

children.


        Considered by Greer, P.J., and Langholz and Sandy, JJ.

**SANDY, Judge.**

A mother and father separately appeal the juvenile court's ruling terminating their parental rights. On appeal, the mother contends that (1) one of the statutory grounds for termination was not established; (2) termination is not in her children's best interests; (3) the juvenile court should have applied a permissive exception to termination; and (4) the juvenile court should have granted her a six-month extension to work toward reunification. The father contends only that termination was not in his child's best interests.

Upon our de novo review of the record, we affirm.

## I. Background Facts and Proceedings

Four children are the subjects of this appeal—N.A., born in 2014; N.C., born in 2016; N.R., born in 2018; and N.D., born in 2022. All four children share the same mother. However, B.A. is the father of N.A. D.B. is the putative father of N.C. and N.R., and C.D. is the father of N.K. Throughout this case, B.A. has lived in Michigan. It is believed D.B. currently lives in Michigan as well. C.D. has been incarcerated during most of this case, but it is currently believed he lives in Chicago, Illinois.

The children first came to the attention of the Iowa Department of Health and Human Services (HHS) in November 2022 after the mother tested positive for marijuana during the birth of N.D. The mother later admitted to smoking marijuana nearly every day during her pregnancy with N.D. to deal with her mental health issues. The mother has been diagnosed with generalized anxiety disorder and major depressive disorder. The mother self-reports that she has been previously diagnosed with bipolar disorder. Following N.D.'s birth, the mother agreed to

participate in voluntary services to address concerns over her mental health and substance use issues. However, the mother's participation in such services over the next few months was minimal.

In February 2023, the mother and the children were evicted from their home. The mother and the children lived out of a motel room following their eviction. But the mother soon ran out of money to continue living out of the motel. In April 2023, HHS stepped in and agreed to pay for a hotel room for the mother and the children. However, shortly after she and the children arrived at the hotel, the mother was arrested for operating while intoxicated in April. The mother was released from custody early the next morning. It is unclear where or who the children stayed with while the mother was in custody. The very next day, the police were called to the mother's hotel room after receiving a report of a loud domestic disturbance between the mother and her purported boyfriend. When the police arrived, the mother's boyfriend jumped out of the hotel room window allegedly because he had an active warrant for his arrest.

Later in April, the children were removed from the mother's custody after the State filed an application for temporary removal. The State filed a child-in-need-of-assistance petition a few days later. On June 8, the children were adjudicated in need of assistance and placed in the custody of HHS for purposes of foster care placement. The mother was subsequently ordered to comply with recommendations for substance use and mental health treatment. Additionally, she was ordered to participate in random drug testing with HHS. B.A. was ordered to complete mental health and substance use evaluations. He also was ordered to participate in random drug testing.

Shortly after the children were removed from the mother's custody, information emerged that revealed the mother has a history of violent relationships with men. N.C. told her foster mother that the children had witnessed C.D. assault the mother while she was pregnant with N.D. According to N.C., C.D. once "beat mommy up so bad that she was bleeding from her face." The record also discloses the mother was previously assaulted by B.A. in 2014. During this incident, B.A. repeatedly struck the mother in the head while she was holding N.A. Additionally, there was testimony at the termination hearing suggesting the mother was subjected to domestic abuse by D.B. Due to concerns over domestic abuse, the mother was ordered by the juvenile court to participate in domestic abuse services.

Despite participating in services, the mother made minimal progress. She began extended outpatient treatment for substance use in May 2023. However, during the early days of this case, she frequently failed to attend her drug test appointments with HHS. Additionally, in June 2023 she tested positive for cocaine. She would also test positive for cocaine a few months later. In September 2023, she tested positive for alcohol. Beginning in the spring of 2024, the mother began to consistently attend drug test appointments. However, this consistency did not last long. Throughout the summer of 2024, she failed to appear for numerous drug test appointments. In June and July, she tested positive for THC and continued to miss testing appointments.

Even during the period when the mother consistently attended drug test appointments and provided negative samples to HHS, there was evidence she was still struggling with substance use. On the afternoon of April 12, 2024, N.R. was scheduled to have dental surgery. The mother showed up to the hospital

visibly intoxicated one hour after N.R. went into surgery. The hospital staff observed the mother slurring her words and staggering on her feet. At some point, the mother fell asleep in the hospital waiting room. When someone attempted to wake the mother up, she "fell out of her seat, hit the floor, convulsed, and then fell asleep." After laying on the floor of the waiting room for a while, the mother awoke and "attempted to put her phone on her foot as if it were her shoe." Eventually, the hospital staff escorted the mother to the emergency room to conduct testing on her. Testing revealed the mother was under the influence of alcohol. The mother also provided a urine sample at the hospital, which tested positive for cannabinoids.

The mother also struggled to adequately address concerns regarding her history of domestically abusive relationships with men. By April 2024, the mother had progressed to semi supervised visitation with the children. However, during her first semi-supervised visit with the children, she broke the visitation rules by calling C.D.[1] One of the children reported the phone call to their foster mother, despite the mother's request to keep the phone call secret. Initially, the mother denied making the phone call. But she later admitted it. A month later, during a visit supervised by Catholic Charities, the mother called D.B. Visits were returned to full supervision following these two incidents. At the time of the termination hearing, the mother's visitation remained fully supervised.

---

[1] At the termination hearing, the mother testified that she kept in contact with C.D. throughout this case. After C.D. got out of prison, the mother sent him money and provided him updates on N.D.

The mother was involved in several domestic altercations with C.D. in July 2024. On the weekend following July 4, C.D. was allegedly in Iowa visiting family. However, the record is clear that he stayed with the mother. On July 7, the police responded to the mother's house after receiving a call for service indicating the mother had been assaulted. At the termination hearing, the mother confirmed she was assaulted by C.D. Additionally, the mother called the police on July 11 and 12 to report that C.D. was harassing her and making violent threats. The mother eventually filed a petition for relief from domestic abuse and received a temporary protective order against C.D. Despite receiving a temporary protective order, the mother was again assaulted by C.D. on July 30. At the termination hearing, the mother denied being in a relationship with C.D.

As for the fathers of the children, B.A. is the only one who has participated in this case. Because B.A. was viewed as a potential placement option for N.A., a home study of his residence was conducted by the Michigan Department of Health and Human Services pursuant to the interstate compact on the placement of children (ICPC).[2] The Michigan Department of Health and Human Services approved the home study, but the Iowa HHS denied it due to concerns over B.A.'s history of domestic abuse and substance use.[3]

---

[2] Of note, the residence evaluated during the home study was B.A.'s mother's residence. B.A. self-reports that he is disabled and cannot read or write. His mother passed away unexpectedly on August 13, 2024. We do not find these facts insignificant.

[3] At a court hearing in this case, B.A. admitted to smoking marijuana. The home study also revealed B.A. allegedly struck the mother of one of his other children in January 2024.

But beyond participating in the home study, B.A.'s participation in this case has been minimal. Despite being court-ordered to obtain substance use and mental health evaluations, B.A. obtained neither. Nor did he provide any documentation that he complied with court-ordered drug testing requirements. At the termination hearing, B.A. testified that he drug tested consistently at the Family Health Center in Michigan. However, when Alex Lichty—assigned HHS case manager—attempted to follow up with the Family Health Center, they disclosed they had not seen B.A. as a patient at the facility. Further, B.A. did not undergo paternity testing even though he was ordered by the juvenile court to do so. During the termination hearing, B.A. blamed his failure to undergo paternity testing on a lack of communication from HHS. However, Lichty testified that she provided B.A. information concerning paternity testing numerous times.[4]

Due to the mother's failure to make progress throughout this case and the fathers' minimal participation, the State filed a petition to terminate each parent's parental rights. A termination hearing was initially held on July 15, 2024, during which the court heard testimony from B.A., Lichty, and Christi Boswood—a court-appointed special advocate. The mother appeared at the hearing and initially consented to the termination of her parental rights pursuant to Iowa Code section 232.116(1)(a) (2024). After brief questioning by her attorney to ensure her consent to termination was made voluntarily and intelligently, the mother was excused from the hearing and left the court room. However, near the end of the hearing, the mother reentered the court room and informed her attorney she

---

[4] Despite being listed on N.A.'s birth certificate, the mother asserted B.A. was not the father of N.A.

wished to withdraw her consent to termination. The juvenile court stated it would not allow the mother to withdraw her consent to termination.

The next day, mother filed a motion to reopen the record, seeking to contest termination. The juvenile court granted this motion and set a hearing for August 14, 2024, during which the mother would be allowed to present evidence. At this hearing, the juvenile court heard testimony from the mother and Mallory Pech—a family support specialist at Mid-Iowa Family Therapy Clinic who worked closely with the mother and children during this case. Following the hearing, the juvenile court issued its ruling terminating each parent's parental rights. The mother's parental rights were terminated pursuant to Iowa Code section 232.116(1)(a), (f), (h), and (l). B.A.'s parental rights for N.A. were terminated pursuant section 232.116(1)(e) and (f). D.B.'s parental rights for N.C. and N.R. were terminated pursuant to paragraphs (b), (e), and (f). Lastly, C.D.'s parental rights for N.D. were terminated pursuant to paragraphs (b), (e), and (h).[5]

The mother and B.A. now appeal separately.

## II. Standard of Review

"We review proceedings terminating parental rights de novo." *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018) (citation omitted). "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010).

---

[5] D.B. and C.D. do not appeal the termination of their parental rights.

**III. Analysis**

The analysis for reviewing the termination of parental rights is a three-step process. *In re A.B.*, 957 N.W.2d 280, 294 (Iowa 2021). First, we determine whether any ground for termination under section 232.116(1) has been established by clear and convincing evidence. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). If a ground for termination has been established, we then consider "whether the best-interest framework as laid out in section 232.116(2) supports the termination of parental rights." *Id.* at 219–20. If we conclude termination of parental rights is in the best interests of a child, we then consider "whether any exceptions in section 232.116(3) apply to preclude termination." *Id.* at 220. "However, if a parent does not challenge a step in our analysis, we need not address it." *In re J.P.*, No. 19-1633, 2020 WL 110425, at *1 (Iowa Ct. App. Jan. 9, 2020).

We now address the mother and B.A.'s arguments separately.

**A. Mother's Appeal**

*1. Statutory Grounds*

On appeal, the mother only challenges termination under section 232.116(1)(a). However, her parental rights to the children were also terminated pursuant to paragraphs (f), (h), and (l). "When the juvenile court terminates parental rights on more than one statutory ground, we may affirm the order on any ground we find supported by the record." *In re K.K.*, No. 16-0151, 2016 WL 1129330, at *1 (Iowa Ct. App. Mar. 23, 2016). Because the mother does not challenge termination under paragraphs (f), (h), and (l), we find she has waived any claim of error on these grounds. *See In re N.N.*, No. 21-1978, 2022

WL 610318, at *1 (Iowa Ct. App. Mar. 2, 2022) (concluding a mother waived any claim of error related to statutory grounds for termination not challenged in her petition). Thus, we affirm the juvenile court's decision that termination was appropriate under paragraphs (f), (h), and (l).

*2. Best Interests*

In considering whether termination of parental rights is in the children's best interest, we give "primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). The defining elements of the best-interest analysis are the children's safety and the need for a permanent home. *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011).

In arguing that termination of her parental rights was not in the best interests of the children, the mother points to her behavior at supervised visits. She contends the evidence shows the specialist supervising her visits with the children "had minimal concerns about the children's safety in the home." She also claims the evidence shows she was "attentive to the children during visits and provided for all of their needs during visits." She also asserts the strong bond between herself and the children counsels against concluding termination is in the children's best interests. We disagree and conclude termination of the mother's parental rights is in the children's best interests for several reasons.

First, we commend the mother for being attentive to her children's needs during her supervised visits with them. However, this fact does not convince us that termination is not in the children's best interests. As our supreme court has explained, "there is a substantial difference between meeting a child's needs under

the supervision and guidance of other people and being able to independently care for a child." *In re J.H.*, 952 N.W.2d 157, 170 (Iowa 2020). And we have previously explained that a parent's visits with their children cannot be viewed in isolation to assess the parent's ability to adequately care for the children. *See In re M.B.*, 553 N.W.2d 343, 345 (Iowa Ct. App. 1996) ("Visitation, however, cannot be considered in a vacuum. It is only one element in what is often a comprehensive, interdependent approach to reunification.").

Second, two of the primary concerns regarding the mother—her history of substance use and violent relationships with men—remain prevalent. The mother has not been able to achieve sobriety despite being afforded nearly two years to do so. She tested positive for marijuana a mere thirteen days prior to the beginning of the termination hearing. To make matters worse, after testing positive for marijuana thirteen days before the termination hearing, the mother subsequently failed to appear for two drug test appointments with HHS. This leads us to conclude termination is in the children's best interests. *See In re M.D.*, No. 21-1784, 2022 WL 468961, at *4 (Iowa Ct. Feb. 16, 2022) (concluding termination was in the children's best interest due to the mother's ongoing substance use).

Further, the mother has not freed herself from the abusive relationships of her past. The mother maintained contact with D.B. and C.D. throughout the case, even though these two men previously subjected her to domestic abuse. Most concerning, the mother allowed C.D. into her home less than ten days before the start of the termination hearing and was subsequently assaulted by him. *See In re N.Y.*, No. 18-1042, 2018 WL 4361076, at *2 (Iowa Ct. App. Sep. 12, 2018)

(finding termination was in the child's best interest due to the mother's continuing contact with her domestic abuser).

Third, while we may consider the parent-child bond in conducting the best-interest analysis, *see In re B.S.*, No. 20-1463, 2021 WL 609093, at *1 (Iowa Ct. App. Feb. 17, 2021), we do not believe the bond between the mother and the children counsels against finding termination is in their best interests. Despite a close bond between the mother and the children, the children have been removed from her care for a significant period of time. And the children have thrived in their placements, where their needs are being fully met. Terminating the mother's parental rights will give the children the best opportunity to achieve much needed permanency. *See In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014) (finding termination was in the child's best interests because it would enable the child to achieve permanency).

Accordingly, we conclude termination of the mother's parental rights is in the children's best interest.

*3. Permissive Exception*

The exceptions to termination under section 232.116(3) are permissive and not mandatory. *See* Iowa Code § 232.116(3). "And for permissive exceptions, the parent claiming the exception has the burden to prove it should apply." *In re L.E.*, No. 24-1263, 2024 WL 4762849, at *3 (Iowa Ct. App. Nov. 13, 2024). Section 232.116(3)(c) provides that the juvenile court may decline to terminate parental rights if "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship."

The mother contends the juvenile court erred in not applying the permissive exception under section 232.116(3)(c) because the evidence shows there was a close bond between her and the children. While we acknowledge there is a close bond between the mother and the children, a close bond is not enough to show application of section 232.116(3)(c)'s permissive exception is warranted. For the exception to be applied, the parent seeking its application must also show termination would be detrimental to the children because of the closeness of the parent-child bond. *See In re R.P.*, No. 23-0419, 2023 WL 3612412, at *2 (Iowa Ct. App. May 24, 2023) (noting "the existence of a bond is not enough" and that a parent must show termination would be detrimental to the child due to that bond). There is no evidence in this record that suggests termination would be detrimental to the children due to the closeness of the children's bond with the mother. And the mother does not point us to such evidence in her petition.

Accordingly, we conclude the juvenile court did not err by declining to apply this permissive exception.

*4. Six-Month Extension*

Finally, the mother contends the juvenile court should have granted her request for six-month extension to work toward reunification. The juvenile court may grant a six-month extension to work toward reunification if it can "enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period." Iowa Code § 232.104(2)(b). After carefully reviewing the record, we believe no such showing can be made by the mother. The mother has made little progress on her sobriety

and has failed to adequately address concerns regarding her history of domestically abusive relationships with men. Additionally, we note that Lichty and Pech—two social workers who worked closely with the mother during this case—opined that it was unlikely the children could be safely returned to the mother's custody at the end of an additional six-month period. We believe this is strong evidence that a six-month extension was not warranted. *See In re A.H.*, No. 23-0328, 2023 WL 3335425, at *3 (Iowa Ct. App. May 10, 2023) (concluding a six-month extension was not warranted where the mother did not achieve sobriety or address concerns of domestic abuse, and the mother's therapist and an HHS caseworker testified the mother was unlikely to make sufficient progress with an additional six months).

Like the juvenile court, we decline to grant the mother a six-month extension.

**B. Father's Appeal**

*1. Best Interest*

On appeal, B.A. only contends that termination of his parental rights is not in N.A.'s best interest. He claims the juvenile court "erred in determining placement could not happen with the father due to his shortcomings with the case plan because there was no evidence to substantiate any concern." Additionally, he claims the only evidence HHS presented was "based upon needless speculation, not any actual, identified concern." We disagree and conclude termination of B.A.'s parental rights is in N.A.'s best interest.

As mentioned previously, in considering the best interest of a child, we give "primary consideration to the child's safety, to the best placement for furthering the

long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child."  Iowa Code § 232.116(2).  The defining elements of the best-interest analysis are the children's safety and the need for a permanent home.  *H.S.*, 805 N.W.2d at 748.

Here, there was evidence B.A. actively smokes marijuana.  He admitted as much to the juvenile court during a court hearing in this case.  While he tries to minimize this fact by pointing out that marijuana is legal in Michigan, the fact that recreational marijuana is legal in Michigan does not mean B.A. can safely parent B.A. while still actively smoking marijuana.[6]  And there is no evidence in this record showing B.A. did anything to address concerns over his substance use.  *See In re A.C.*, No. 20-0736, 2020 WL 4516075, at *3 (Iowa Ct. App. Aug. 5, 2020) (concluding termination of the father's parental rights was in the child's best interest "because the father's lack of meaningful participation in services showed an unwillingness to make the changes necessary to have the child placed in his care").

Additionally, the evidence in the record shows that B.A. has a history of domestic abuse.  B.A. does not dispute that he assaulted the mother in 2014 while she was holding N.A.  Further, there are allegations contained in the Michigan home study that B.A. assaulted the mother of one of his other children in January 2024.  B.A. has not presented any evidence that he completed any programming to alleviate concerns over his history of domestic abuse.  *See In re S.W.*, No. 02-2091, 2003 WL 1055171, at *1 (Iowa Ct. App. Mar. 12, 2003)

---

[6] The father reported he discontinued using marijuana, but he presented no evidence to verify such a claim.

(concluding termination of a father's parental rights was in the child's best interest due, in part, to the father's history of physical abuse).[7]

And while B.A. makes much of the fact that he was approved by the Michigan Department of Health and Human Services as placement option, that home study was completed while B.A. was living at his mother's residence. As the juvenile court pointed out in its thorough ruling, his mother has since passed away. Thus, it is unclear if B.A. would even have stable housing for N.A. *In re C.S.*, No. 08-1665, 2008 WL 5235655, at *2 (Iowa Ct. App. Dec. 17, 2008) (concluding termination was in the child's best interest due, in part, to the mother's unstable housing).

Accordingly, we agree with the juvenile court that termination of B.A.'s parental rights is in N.A.'s best interest.[8]

**IV. Conclusion**

In sum, we affirm the juvenile court's ruling terminating both appellants' parental rights.

**AFFIRMED ON BOTH APPEALS.**

---

[7] We note B.A. did offer one exhibit at the termination hearing which he claims is a certificate for a domestic violence program he completed. The exhibit was admitted, but the exhibit is blurred and is not legible. From the record, it does not appear the juvenile court ever received a physical copy of the certificate.

[8] In the alternative, the father asks that he be granted a six-month extension to work toward reunification. However, the juvenile court never ruled on a six-month extension for B.A. Thus, we conclude he has not preserved error on this argument. *See In re Est. of Laube*, No. 20-1399, 2022 WL 108937, at *5 (Iowa Ct. App. Jan. 12, 2022) (per curiam) ("Error preservation generally involves two steps: (1) properly raising the issue before the district court and (2) obtaining a ruling.").